SENTENCIA
La Ley Núm. 69 de 30 de mayo de 2002 (Ley Núm. 69) enmendó las Sees. 4002 y 4023 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. sees. 9521 y 9574. La enmienda realizada tuvo el propósito de aumentar los impuestos aplicables a los espíritus destilados, los vinos y las cervezas. Dicha Ley Núm. 69, sin embargo, concede un alivio al establecer en su Art. 2 (13 L.P.R.A. see. 9574) una exención contributiva escalonada a toda cerveza, extracto de malta y otros productos análogos fermentados, o no fermentados, cuyo contenido alcohólico no exceda del uno y medio por ciento por volumen, que sean producidos o fabricados por personas cuya producción total durante su año contributivo más reciente no exceda de treinta y un millones de galones.
Los aquí peticionarios, la Asociación Puertorriqueña de Importadores de Cerveza, Inc. y otros, presentaron una solicitud de sentencia declaratoria ante la Sala Superior de San Juan del Tribunal de Primera Instancia contra el Estado Libre Asociado de Puerto Rico y otros para que se *142 decretara la inconstitucionalidad del mencionado Art. 2 de la Ley Núm. 69. Plantearon que, a su juicio, la referida disposición estatutaria tenía el propósito y efecto de favorecer la cerveza producida en nuestra Isla y, naturalmente, de perjudicar a las cervezas importadas. Adujeron, además, que dicha disposición violaba la cláusula de comercio interestatal de la Constitución de Estados Unidos y el Art. 3 de la Ley de Relaciones Federales con Puerto Rico, 48 U.S.C.A. sec. 741(a) y L.P.R.A., Tomo 1, See. 3, respectivamente.
La parte demandada solicitó la desestimación de la demanda presentada alegando, en síntesis, que la decisión emitida por este Tribunal en U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980), había resuelto la controversia planteada y que no existía violación constitucional alguna. El tribunal de instancia desestimó la demanda presentada, decisión que fue confirmada por el Tribunal de Apelaciones.
Los demandantes peticionarios acudieron, entonces, ante este Tribunal, señalando la alegada comisión de tres errores de parte del Tribunal de Apelaciones, a saber:
... al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.
... al determinar que el Artículo 2 no viola la See. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980).
... al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal. Petición de certiorari, pág. 5.
Expedimos el recurso. Examinado el expediente del caso y habiendo analizado cuidadosamente todos los planteamientos de las partes, se procede a dictar una sentencia confirmatoria de la emitida por el Tribunal de Apelaciones *143 y decretar la desestimación de la acción presentada por la parte demandante peticionaria.
Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri emitieron sendas opiniones de conformidad. La Juez Asociada Señora Fiol Matta se inhibió. La Juez Asociada Señora Rodríguez Rodríguez no interviene.
(.Fdo.) Aida Ileana Oquendo Graulau

Secretaria del TribunalSupremo

Opinión de conformidad emitida por el
Juez Asociado Señor Rebollo López.
El 13 de julio de 1978 se aprobó la Ley Núm. 37, mediante la cual se enmendó la Ley Núm. 143 de 30 de junio de 1969, conocida como la Ley de Bebidas de Puerto Rico de 1969 (13 L.P.R.A. sees. 6006 y 6021a). Dicha enmienda consistió en aumentar la contribución sobre la cerveza que se vende y consume en nuestra jurisdicción y establecer una exención especial para las compañías productoras de cerveza, cuya producción anual no sobrepase los treinta y un millones de galones.
Poco tiempo después, la U.S Brewers Association, entidad que entonces agrupaba al 95% de los manufactureros de cerveza de Estados Unidos, presentó ante el foro local una demanda para impugnar la referida exención porque, a su entender, violaba la See. 3 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1 (48 U.S.C.A. sec. 741a) y la cláusula sobre la igual protección de las leyes en la See. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Al resolver la controversia, este Tribunal determinó que la exención no violaba las disposiciones mencionadas porque, entre otras cosas, tenía un *144 propósito legítimo, no discriminatorio, y porque la clasificación allí establecida podía favorecer tanto a las empresas locales como a las extranjeras. U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980).
Luego de ser enmendada en dos ocasiones posteriores, para los únicos efectos de aumentar el monto de la contribución,(1) la Asamblea Legislativa aprobó la Ley Núm. 69 de 30 de mayo de 2002, mediante la cual enmendó las Sees. 4002 y 4023 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. secs. 9521 y 9574. Dichas enmiendas, entre otras cosas, tuvieron el propósito de aumentar los impuestos aplicables a los espíritus destilados, los vinos y las cervezas. Como alivio para el aumento, la Legislatura concedió en el Art. 2 de la mencionada ley, 13 L.P.R.A. sec. 9574, una exención contributiva escalonada a toda cerveza, extracto de malta y otros productos análogos fermentados, o no fermentados, cuyo contenido alcohólico no excediera de 1 V2% por volumen, que sean producidas o fabricadas por personas cuya producción total durante su año contributivo más reciente no haya excedido de treinta y un millones galones medida.(2)
*145 Así las cosas, el 13 de junio de 2002, la Asociación Puertorriqueña de Importadores de Cerveza, Inc. (APIC); Heineken Brouwerijen B.V.; V. Suárez & Co., Inc.; Méndez & Co., Inc.; B. Fernández & Hnos., Inc., y Ballester Hermanos, Inc. (los peticionarios) presentaron una solicitud de sentencia declaratoria ante el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Estado Libre Asociado de Puerto Rico, el Secretario de Hacienda, Cervecería India, Inc. y CC1 Beer Distributors, Inc. (los recurridos). Solicitaron que se decretara la inconstitucionalidad del Art. 2 de la Ley Núm. 69, ante, porque, a su entender, tenía el efecto y propósito de favorecer a la cerveza producida en Puerto Rico y perjudicar a las cervezas importadas. Solicitaron, además, que se decretara, mediante la referida sentencia declaratoria, que el citado Art. 2 violaba tanto la cláusula de comercio interestatal de la Constitución de Estados Unidos(3) como la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Finalmente, solicitaron que se dictara un interdicto preliminar en el que se le impidiera al Gobierno de Puerto Rico poner en vigor la disposición legal, en lo que se dilucidaba el pleito en sus méritos.
Posteriormente, todos los demandados solicitaron la desestimación de la acción presentada, oponiéndose a la solicitud de interdicto preliminar.(4) En esencia alegaron que, aun asumiendo como ciertos los hechos bien alegados en la acción presentada, la parte demandante no había ex- *146 puesto una reclamación que justificara la concesión de los remedios solicitados. Plantearon, en apoyo a su solicitud, que lo resuelto en U.S. Brewers Assoc. v. Srio. de Hacienda, ante, controlaba la controversia surgida en el caso; que no existía violación alguna a la cláusula de comercio interestatal, ya que la exención era totalmente neutral y no discriminaba contra el comercio interestatal o internacional ni de su faz ni por su propósito o efecto, y que no existía violación alguna a la Ley de Relaciones Federales con Puerto Rico, ya que este Tribunal había determinado la legalidad de dicha disposición.
Luego de evaluar la posición de ambas partes en sus respectivos escritos y los argumentos expuestos en una vista argumentativa, el foro primario emitió una sentencia en la que desestimó la acción presentada por los demandantes. El referido foro sostuvo que: (1) lo resuelto por este Tribunal en U.S. Brewers Assoc. v. Srio. de Hacienda, ante, disponía de la reclamación de los demandantes, relativa a que el Art. 2 de la Ley Núm. 69, ante, contravenía la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante; (2) la alegación en torno a que el efecto de la exención impugnada atentaba contra la cláusula de comercio interestatal e internacional era inmeritoria debido a que en U.S. Brewers Assoc. v. Srio. de Hacienda, ante, este Tribunal había resuelto, aunque no se planteó específicamente, que dicha exención tenía el propósito legítimo de distribuir la carga contributiva entre las cervecerías, de acuerdo con su potencial para producir ganancias,(5) y (3) el análisis exigido ante alegaciones de *147 supuestas violaciones a la cláusula de comercio interestatal e internacional, por el supuesto efecto discriminatorio de alguna ley, revelaba que el artículo de ley impugnado en el caso no era discriminatorio.
Inconformes con la determinación del foro primario, los demandantes acudieron —mediante una Petición de certiorari— ante el Tribunal de Apelaciones. Adujeron, en síntesis, que el foro de instancia había errado al desestimar la acción presentada sin dar como ciertos los hechos alegados en la demanda y al no recibir prueba ofrecida sobre el propósito y efecto discriminatorio de la exención. Alegaron, además, que el tribunal de instancia había interpretado incorrectamente el caso U.S. Brewers Assoc. v. Srio. de Hacienda, ante, al resolver que la exención impugnada no violaba la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, ni la mencionada cláusula de comercio interestatal e internacional.
El Tribunal de Apelaciones confirmó la decisión del foro primario. En esencia, el tribunal apelativo intermedio sostuvo que actuó correctamente el foro de instancia, al desestimar la acción presentada debido a que éste sí dio como ciertos los hechos correctamente alegados en la demanda y que el resto de los “hechos” allí expuestos eran conclusiones de derecho o manifestaciones especulativas. En cuanto a los alegados ofrecimientos de prueba, el foro apelativo intermedio concluyó que el foro primario sí los dio como ciertos pero que, aun así, ello no ameritaba la concesión de un remedio a favor de los demandantes. Finalmente, el referido foro apelativo estimó que, conforme a la doctrina de stare decisis, lo resuelto por este Tribunal en U.S. Brewers Assoc, v. Srio. de Hacienda, ante, aplicaba a esta controversia en cuanto a la alegación referente a la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, y que tampoco tenía los propósitos proteccionistas que la invalidaran a la luz de la cláusula de comercio interestatal e internacional de la Constitución de Estados Unidos.
*148 Inconformes, los demandantes acudieron —mediante una Petición de certiorari— ante este Tribunal. Alegan que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió
... al confirmar la desestimación de la Petición Jurada sin haber dado por ciertos los hechos aseverados en la demanda y tomando por ciertos otros que no surgían de la misma, contrario a la norma para la desestimación bajo la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa.
... al determinar que el Artículo 2 no viola la See. 3 LRF ni la Cláusula de Comercio, aplicando equivocadamente lo resuelto en el caso de U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980).
... al restringir su análisis sobre el propósito del Artículo 2 al texto de la Ley 69, así ignorando la norma de interpretación pautada por este Honorable Tribunal. Petición de certiorari, pág. 5.
I
A. De entrada discutiremos, brevemente, el primer señalamiento de error, relativo a la alegada improcedencia de la desestimación al amparo de las disposiciones de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III.
Como se sabe, las alegaciones tienen el propósito de notificar a grandes rasgos cuáles son las reclamaciones y defensas de las partes. Álamo Pérez v. Supermercado Grande, Inc., 158 D.P.R. 93 (2002); Bco. Central Corp. v. Capitol Plaza Inc., 135 D.P.R. 760 (1994). Es por ello que la Regla 6.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, sólo exige que las alegaciones de la demanda contengan una relación sucinta y sencilla de la reclamación demostrativa de que el peticionario tiene derecho a un remedio y una solicitud del remedio a que crea tener derecho. Véase J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. 1, págs. 202-208.
A pesar de ello, la Regla 10.2 de Procedimiento Civil, ante, establece como fundamento por el cual una parte *149 puede solicitar la desestimación de una demanda presentada en su contra, que las alegaciones dejan de exponer una reclamación que justifique la concesión de un remedio. Reiteradamente hemos resuelto que, ante una solicitud de desestimación por el fundamento antes mencionado, los tribunales deben aceptar como ciertas las alegaciones contenidas en la demanda y considerarlas de la manera más favorable a la parte demandante. García v. E.L.A., 163 D.P.R. 800 (2005).
Para que un demandado prevalezca, mediante una moción de desestimación según el mencionado precepto procesal civil, éste tiene que demostrar que con toda certeza el demandante no tiene derecho a remedio alguno, según cualquier estado de derecho que pueda ser probado en apoyo a su reclamación, aún interpretando la demanda de la manera más liberal posible a su favor. No obstante lo anterior, esta doctrina se aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. Pressure Vessels P.R. v. Empire Gas P.R., 137 D.P.R. 497, 504-505 (1994). Dicho de otra manera, solamente se darán como ciertos los hechos correctamente alegados sin considerar las conclusiones de derecho o las alegaciones redactadas, de tal forma que su contenido resulte hipotético. Cuevas Segarra, op. cit., pág. 272.
De un análisis de la petición jurada presentada por los peticionarios se desprende que éstos, básicamente, alegaron que la exención contributiva concedida a los distribuidores de cerveza que produjeran menos de 31,000,000 galones era inconstitucional por violar la cláusula constitucional federal sobre el comercio interestatal y la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. En apoyo de lo anterior hicieron una serie de alegaciones mediante las cuales pretenden establecer el efecto discriminatorio de dicha exención. Algunas de estas alegaciones son las siguientes:
*150 18. Esta acción pretende la anulación, por [ser] contraria a la Ley de Relaciones Federales [con] Puerto Rico y a la Cláusula de Comercio de la Constitución de Estados Unidos, de aquellas secciones que crean una excepción en la tasa impositiva a favor de una empresa manufacturera privada de Puerto Rico, en detrimento del comercio internacional e interestatal y de los intereses propietarios de otras compañías locales, estadounidenses y extranjeras, las que están sufriendo y continuarán sufriendo daños irreparables ....
19. En efecto, y como adelante se alega, la legislación en cuestión crea un discrimen de tal naturaleza, que prácticamente elimina el derecho de los consumidores a adquirir la cerveza de su preferencia y propende a un monopolio sancionado por el estado a favor de una única productora y su distribuidor exclusivo.
38. Todas las partes demandantes quedan afectadas por el arbitrio de ley, no aplicándoles la exención especial.
39. Por información o creencia, solo la productora local, Cervecería India, y su distribuidor para la Medalla Light, su principal producto, se beneficiarán de la exención especial, o sea, ahora están sujetas a pagar solamente el arbitrio de $2.15 que prevalecía para ellos bajo la legislación anterior. Ello es así porque la producción total de la cervecería local no excede de 9 millones de galones ni lo ha excedido por años.
43. Aunque la medida ni su exposición de motivos expresan de su faz un ánimo discriminatorio o proteccionista, inconstitucional y estatutariamente prohibido, en su efecto, sin lugar a dudas lo tiene.
44. A poco que se examine el historial legislativo y las ponencias presentadas ante la Legislatura, y los debates legislativos y otras manifestaciones públicas de los legisladores, se verá claramente que, a pesar de la reticencia en un principio del Ejecutivo y el Legislativo en perpetuar el discrimen creado por la exención especial, ni la medida ni el presupuesto pendiente de aprobación hubieran obtenido los votos necesarios de no darse el trato preferente excesivo que esta medida propone, únicamente para el beneficio de la cervecería local. Véase, Ponencia de la Vice-Presidenta Ejecutiva de la Cervecería India, del 8 de abril de 2002; Ponencia del Alcalde de Mayagüez, en apoyo a las peticiones de trato preferente a la cervecería local, entre otros.
46. El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. [see.] 4023, en sus efectos y aplicación, crea una res *151 tricción prohibida al comercio interestatal, al promover un discrimen, irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo de comercio.
47. El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de Estados Unidos, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas en Estados Unidos, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen estadounidense.
50. El Artículo 2 de la Ley 69 del 30 de mayo de 2002, 13 L.P.R.A. [see.] 4023, en sus efectos y aplicación, crea una restricción prohibida al comercio internacional, al promover un discrimen irracional, restrictivo e injusto a favor de un solo productor local, y en perjuicio del libre flujo del comercio.
51. El peso total del aumento, aunque de la faz de la Ley parece aplicar por igual a entidades de Puerto Rico y de fuera de Puerto Rico, en efecto recae totalmente sobre los distribuidores puertorriqueños que venden cervezas manufacturadas fuera de Puerto Rico, con el propósito prohibido de dificultar la importación, mercadeo y venta de las cervezas de origen extranjero.
55. El Artículo 2 de la Ley Núm. 69 del 30 de mayo de 2002, 13 L.P.R.A. § 4023, en su aplicación y efectos, según anteriormente alegados, violan la clara y diáfana disposición del Artículo 3 de la Ley de Relaciones Federales. Petición jurada, págs. 5-15, Apéndice, págs. 42-52.
Aun cuando las transcritas alegaciones no son un modelo de perfección, una mera lectura es suficiente para percatarse de que éstas pueden considerarse como alegaciones bien hechas, para los efectos de conceder el remedio solicitado. De hecho, tanto el tribunal de instancia como el foro apelativo intermedio entraron a analizar las alegaciones esenciales efectuadas por los peticionarios y, finalmente, determinaron que eran inmeritorias.
En consecuencia, pasamos a evaluar la validez del planteamiento principal de los peticionarios relativo a que el Art. 2 de la Ley Núm. 69, ante, discrimina contra el comercio interestatal e internacional y, por lo tanto, viola la cláu *152 sula de comercio interestatal o la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante.
B. La Constitución del Estado Libre Asociado de Puerto Rico dispone que “el poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido”. Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 401. Dicha autoridad contributiva es fundamental a la vida del Estado y, por lo tanto, el poder fiscal gubernamental es constitucionalmente de naturaleza amplia y abarcadora. Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548 (2001); Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146 (2001); F.D.I.C. v. Mun. de San Juan, 134 D.P.R. 385 (1993); Coca-Cola Bottling Co. v. Srio. de Hacienda, 112 D.P.R. 707 (1982); U.S. Brewers Assoc. v. Srio. de Hacienda, ante.
No obstante, el amplio poder mencionado cede ante las limitaciones constitucionales o de otra índole. Una de esas limitaciones la establece la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, ed. 1999, pág. 210, que, en lo pertinente, indica que
... las contribuciones de rentas internas que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías o mercancías podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la Isla; Disponiéndose, que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico .... (Enfasis suplido.)
Asimismo, la cláusula de comercio interestatal de la Constitución de Estados Unidos establece:
El Congreso tendrá facultad: Para imponer y recaudar contribuciones, derechos, impuestos y arbitrios ....
*153 Para reglamentar el comercio con naciones extranjeras, así como entre los estados y con las tribus indias... Art. I, Sec. 8, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1999, pág. 167.
El propósito de dicho precepto constitucional fue conceder poder al Congreso para regular tanto el comercio interestatal como el internacional. Por ello, se ha dicho que ésta es la máxima fuente del poder congresional. L.H. Tribe, American Constitutional Law, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, págs. 801-808.
Por otro lado, y a pesar de que la Constitución federal en ningún lugar limita la interferencia estatal con el comercio interestatal, el Tribunal Supremo federal ha interpretado desde 1852 que la cláusula de comercio también contiene una prohibición implícita al poder de los estados de regular el comercio interestatal e internacional, aun en ausencia de legislación federal expresa. Véanse: Tribe, op. cit, pág. 1029; Cooley v. Broad of Wardens, 53 U.S. 299 (1851). A este aspecto de la cláusula de comercio se le llama el “aspecto durmiente o negativo”. U.S. v. South-Eastern Underwriters Assn., 322 U.S. 533, 552 (1944); Southern Pacific Co. v. Arizona, 325 U.S. 761 (1965). Este aspecto negativo previene que los estados arriesguen el bienestar de la Nación “by placing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear”. (Citas omitidas.) American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, 545 U.S. 429 (2005), citando a Oklahoma Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 180 (1995).
Respecto a la aplicación de la cláusula de comercio en nuestra jurisdicción, este Tribunal ha expresado, tanto antes como después de la aprobación de nuestra Constitución, que esa cláusula no aplica al Estado Libre Asociado. South P.R. Sugar Corp. v. Com. de Servicio Púb., 93 D.P.R. 12 (1966); R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964); Ballester Hnos. v. Tribunal de Contribuciones, 66 *154 D.P.R. 560 (1946). Entre los argumentos que hemos esbozado para llegar a tal determinación están, entre otros, el estatus de territorio no incorporado de Puerto Rico antes de la aprobación de la Constitución y los perfiles distintos que han tenido las relaciones comerciales entre Puerto Rico y Estados Unidos, y entre los estados de Estados Unidos.
No obstante lo anterior, en decisiones más recientes nos hemos alejado de esa postura y hemos dejado entrever que la controversia no está resuelta del todo.(6) Específicamente, en M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987), indicamos que, en ese momento, era innecesario resolver si la cláusula de comercio interestatal en su “estado durmiente” aplicaba a Puerto Rico. Asimismo, en Gómez Hnos., Inc. v. Secretario de Hacienda, 114 D.P.R. 367 (1983), utilizamos, para resolver la validez de un impuesto local, los requisitos que la jurisprudencia federal había acogido para evaluar la procedencia de legislaciones tributarias estatales frente a la cláusula de comercio. Finalmente, en Banco Popular v. Mun. de Mayagüez, 126 D.P.R. 653 (1990), aunque no resolvimos la controversia según el análisis creado para el “aspecto durmiente” de la cláusula de comercio, sí describimos parte de éste como si aplicara totalmente en nuestra jurisdicción hasta el punto de indicar que la ley allí impugnada podría ser inconstitucional según el aludido análisis.(7)
Este caso nos brinda la oportunidad de resolver, en forma definitiva, la interrogante relativa a si la cláusula de comercio en su “estado durmiente” aplica a Puerto Rico. Así pues, antes de entrar a discutir los méritos de las alegacio *155 nes de los peticionarios en el caso, procederemos a discutir la interrogante. Veamos.
1. De un examen exhaustivo de la jurisprudencia —tanto local como federal— y de los tratadistas de derecho constitucional se desprende que la interrogante expresada no ha sido ampliamente discutida, provocando así que sea escaso el número de fuentes de derecho que nos ayuden a resolverla. Sin embargo, surge de las fuentes existentes que, con el pasar de los años, se han esbozado varios argumentos a favor y contra la aplicación de la cláusula de comercio a nuestra jurisdicción.
Entre los fundamentos más contundentes contra la aplicación están, entre otros, que: (1) a Puerto Rico nunca le ha aplicado la Constitución federal en toda su extensión, ya que nunca ha sido considerado como un estado; (2) que la relación de Puerto Rico con Estados Unidos, a partir de 1952, es única, por lo que Puerto Rico no puede catalogarse como estado ni como territorio no incorporado para los efectos de la cláusula aludida; (3) que ni en nuestra Constitución, ni en la Ley Pública 600, ni en la Ley de Relaciones Federales con Puerto Rico se estableció que dicha cláusula aplicaría a Puerto Rico, por lo que no formó parte del pacto efectuado entre Estados Unidos y Puerto Rico. Véanse: Sancho v. Bacardi Corporation of America, 109 F.2d 57 (1er Cir. 1940) (revocado por otros motivos en Bacardi Corp. v. Domenech, 311 U.S. 150 (1940)); Mora v. Torres, 113 F. Supp. 309 (D. P.R. 1953); R.C.A. v. Gobierno de la Capital, ante.
Por otro lado, los argumentos más persuasivos a favor de la aplicación de la cláusula de comercio a Puerto Rico son: (1) que aplica a Puerto Rico a través de la cláusula territorial; (2) que la intención del Congreso al permitir la aprobación de la Constitución del Estado Libre Asociado (E.L.A.) era organizar un gobierno local, por lo que su adopción en ningún momento altera la aplicabilidad a Puerto Rico de las leyes de Estados Unidos y de la jurisdic *156 ción federal en Puerto Rico; (3) los amplios poderes del Congreso para regular el comercio en general incluyendo el de Puerto Rico; (4) la obvia aplicabilidad a Puerto Rico del principio de uniformidad en el comercio y mercado común. Véanse: Starlight Sugar Inc. v. Soto, 253 F.3d 137 (1er Cir. 2001); Sea-Land Services, Inc. v. Municipality of San Juan, 505 F. Supp. 533 (D. P.R. 1980); R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 341.(8)
La mayoría de los planteamientos mencionados provienen de varias decisiones del Tribunal de Distrito Federal para el Distrito de Puerto Rico y del Primer Circuito de Apelaciones. En un principio, ambos foros habían determinado que la cláusula de comercio no aplicaba a Puerto Rico. Mora v. Torres, ante; Buscaglia v. Ballester, 162 F.2d 805 (1er Cir. 1947); Lugo v. Suazo, 59 F.2d 386 (1er Cir. 1932). Luego, los referidos foros variaron su criterio y resolvieron que era de completa aplicación al Estado Libre Asociado.
El primero de los casos, en los que se resolvió a favor de la aplicación de la mencionada cláusula, fue Sea-Land Services, Inc. v. Municipality of San Juan, ante. En aquella ocasión el Tribunal de Distrito Federal para el Distrito de Puerto Rico concluyó que el poder otorgado al Congreso a través de la cláusula territorial(9) obligaba a resolver que *157 la cláusula de comercio aplicaba a Puerto Rico tanto en su aspecto positivo como en su aspecto durmiente. Añadió el aludido foro, que las razones que llevaron a los constituyentes a aprobar la cláusula de comercio aplican a las relaciones comerciales entre Puerto Rico y los estados o países extranjeros, y que resolver que la cláusula no aplica a Puerto Rico provocaría rivalidades con los estados y evitaría la uniformidad regulatoria en casos en los que el Congreso lo entendiera pertinente.
A pesar de la determinación anterior, no fue hasta 1992 que el Primer Circuito de Apelaciones tuvo la oportunidad de variar sus pronunciamientos hechos en Buscaglia v. Ballester, ante, y en Lugo v. Suazo, ante, entre otros, referentes a la inaplicabilidad de la cláusula de comercio a Puerto Rico. Dicha oportunidad surgió en el caso Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 8-9 (1er Cir. 1992), en el cual entre otras cosas el referido foro indicó:
... Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine. In the Supreme Court’s words, “the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union ...” Examinig Board v. Flores de Otero, 426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed. 2d 65 (1976). (Énfasis suplido.)
El mencionado foro expresó, además:
The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation’s commerce. This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union. In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an “intermediate boundary” separating it from the rest of the country. There is no reason *158 to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise. (Citas omitidas y énfasis suplido.)
Para llegar a dicho resultado, el Primer Circuito también se apoyó en pronunciamientos jurisprudenciales hechos por otros circuitos. Entre ellos el hecho por el Noveno Circuito en Anderson v. Mullaney, 191 F.2d 123, 127 (9no Cir. 1951), en el cual se determinó que la doctrina de la cláusula de comercio durmiente aplicaba al entonces territorio de Alaska y al hecho por el Tercer Circuito en JDS Realty Corp. v. Goverment of Virgin Islands, 824 F.2d 256, 259-260 (3er Cir. 1987), que hizo lo propio para el actual territorio de las Islas Vírgenes.
En cuanto a dichas decisiones —las relativas a Alaska y a las Islas Vírgenes— debemos resaltar, más allá de las diferencias entre el tipo de relación que tienen con Estados Unidos en comparación con Puerto Rico, el lenguaje contenido en Anderson v. Mullaney, ante, pág. 128:
But we cannot conceive that in granting legislative power to the Territorial Legislature it was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce. The words “all rightful subjects of legislation” describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. “All rightful subjects of legislation” must be held to refer to matters local to Alaska.
En decisiones posteriores, el Primer Circuito de Apelaciones ha reiterado, sin mayor explicación, la aplicabilidad de la cláusula de comercio a Puerto Rico. A tales efectos, véanse: United Egg Producers v. Department of Agriculture, 77 F.3d 567 (1er Cir. 1996); Starlight Sugar, Inc. v. Soto, ante. Finalmente, vale la pena destacar que tan reciente como en abril de 2005, el referido foro federal resolvió el caso Walgreens Co. v. Rullan, 405 F.3d 50 (1er Cir. *159 2005), en el cual reiteró lo mencionado al determinar que una ley local que exigía certificados de necesidad y conveniencia a toda persona que interesara adquirir o construir un establecimiento para el cuidado de la salud en la isla —entre ellos las farmacias— violaba el aspecto durmiente de la cláusula de comercio de la Constitución federal y, por ende, era inválida. Dicha decisión fue recurrida, mediante una petición de certiorari, ante el Tribunal Supremo federal el 4 de noviembre de 2005. Posteriormente, el 9 de enero de 2006 el Supremo federal denegó la expedición del recurso solicitado. Véase Pérez Perdomo v. Walgreen Co. et al., 163 L.Ed.2d 928 (2006).
Ciertamente, todos los argumentos mencionados son altamente persuasivos e incluyen aspectos políticos que deberían resolverse en un foro diferente al judicial. No obstante, creemos que, dadas las circunstancias particulares de nuestra relación con Estados Unidos, los argumentos a favor de la aplicación a Puerto Rico de la cláusula de comercio, en su estado durmiente, son más persuasivos que los argumentos en contra.
Primeramente, son hechos que no pueden ser controvertidos que la relación de Puerto Rico con Estados Unidos es sui generis(10) —que no puede ser catalogada como de territorio incorporado o de territorio no incorporado— y que, sea cual sea dicha relación, el Congreso tiene el poder —a través de la cláusula territorial— de regular tanto el comercio interestatal como el internacional en Puerto Rico. A raíz de lo anterior, no resultaría correcto atender la controversia relativa a la aplicabilidad del aspecto durmiente de la cláusula de comercio a nuestra jurisdicción, según la simple aseveración de que la cláusula de comercio no aplica por su propio vigor a los territorios no incorporados.
Así pues, a pesar de existir una relación especial y única entre Estados Unidos y Puerto Rico, no debe quedar duda *160 de que, en términos de los poderes conferidos para autogobernarse, el Estado Libre Asociado y los estados que componen la Unión Americana son extremadamente semejantes. Véanse: Examining Bd. v. Flores de Otero, 426 U.S. 572, 595 (1976); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 671 (1974). Ciertamente, Puerto Rico no es un país ni un territorio independiente para poder tener la libertad de aprobar leyes que atenten contra la estabilidad del comercio interestatal. Véase Trailer Marine Transport Corp. v. Rivera Vazquez, ante.
Además de lo antes expresado, consideramos que existen otros argumentos que sustentan con igual contundencia la aplicación del aspecto durmiente de la cláusula de comercio en nuestra jurisdicción. A tales efectos, enfatizamos las expresiones del Primer Circuito de Apelaciones en Trailer Marine Transport Corp. v. Rivera Vazquez, ante, relativas a que la completa integración económica —propósito fundamental de la cláusula de comercio— es igual de esencial para Puerto Rico como para cualquier estado de la Nación Americana. Dicho de otra manera, no existe fundamento jurídico válido para sustentar que Puerto Rico —en ausencia de legislación federal— pueda discriminar contra productos de otros estados, o extranjeros, beneficiando así a los suyos.
Ciertamente, no debe quedar duda en la mente de persona alguna que —por lo menos en materia comercial— Estados Unidos ostentan un amplio poder para evitar lo que el Tribunal Supremo federal ha denominado como “the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation”. Granholm v. Heald, 544 U.S. 460, 472 (2005), citando a Hughes v. Oklahoma, 441 U.S. 322, 325-326 (1979).
Finalmente, en ausencia de disposición expresa que ex-cluya a Puerto Rico de la aplicación del aspecto durmiente *161 de la cláusula de comercio,(11) no existe razón para creer que el Congreso autorizó a Puerto Rico a discriminar contra el comercio interestatal e internacional. De igual forma, sería arriesgado sostener lo contrario existiendo en la Ley de Relaciones Federales con Puerto Rico una disposición que impide que la Legislatura del Estado Libre Asociado establezca “distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico”. (Énfasis suplido.) See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante, pág. 210.
En virtud de todo lo antes expuesto, entendemos que la doctrina relativa al estado durmiente de la cláusula de comercio de la Constitución de Estados Unidos aplica al Estado Libre asociado de Puerto Rico, según la ha desglosado el Tribunal Supremo federal.
C. Ahora bien, expresado lo anterior procede que nos preguntemos cuál es el análisis requerido ante una alegada violación a la doctrina.
Como ya mencionamos, el aspecto durmiente o negativo de la cláusula de comercio impide que —aun ante la ausencia de legislación federal vinculante— un estado apruebe leyes que afecten el comercio interestatal o internacional que perjudiquen productos extranjeros o beneficien productos locales. En otras palabras, y según ha expresado el Tribunal Supremo federal, “[t]he negative or dormant im *162 plication of the Commerce Clause prohibits state regulation that discriminates against or unduly burdens interstate commerce and thereby ‘imped [es] free private trade in the national marketplace’ (Citas omitidas.) General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997).
Como señalan los conocidos tratadistas Rotunda y Nowak, el aspecto durmiente de la cláusula de comercio busca prevenir que los estados impongan medidas económicamente proteccionistas. Asimismo indican que es irrelevante si la ventaja es para los comerciantes locales o para los consumidores locales, y que ambas situaciones violan el aspecto negativo de la cláusula de comercio. 2 Rotunda and Nowak, Treatise on Constitutional Law 3rd, Sec. 11.1 pág. 133 (1999).
El enfoque actual del Tribunal Supremo federal, según el reconocido tratadista Laurence H. Tribe, va dirigido a otorgar un mayor énfasis en la pregunta relativa a si el estatuto en controversia discrimina con el comercio interestatal o internacional. Tribe, op. cit., pág. 1059. De este modo, una ley estatal que discrimine contra el comercio interestatal, ya sea de su faz■ o por su efecto, será invalidada a menos que el estado demuestre que el estatuto persigue un propósito local legítimo y que dicho propósito no puede ser cumplido con medidas no discriminatorias. íd.
Ahora bien, una ley que no sea discriminatoria ni de su faz ni por su efecto, pero que afecte indirectamente al comercio interestatal, podrá ser inválida si el peso impuesto al comercio es claramente excesivo en relación con los beneficios putativos locales. Oregon Waste Systems, Inc. v. Department of Enviroment Quality of Ore., 511 U.S. 93, 99 (1994).(12)
En lo que respecta al aspecto específico sobre legislaciones contributivas estatales, el Tribunal Supremo federal *163 ha establecido una regla cardinal, de forma compatible con la cláusula de comercio, que dispone que ningún estado podrá imponer un impuesto que discrimine contra el comercio interestatal, proveyendo una ventaja comercial directa a los comercios locales. Bacchus Imports, LTD. v. Dias, 468 U.S. 263, 268 (1984). Véanse: Boston Stock Exchange v. State Tax Comm’n, 429 U.S. 318, 329 (1977); Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 458 (1959).
Con el pasar de los años, la doctrina relativa al análisis de las referidas leyes estatales ha quedado plasmada de la manera siguiente: un impuesto estatal —ante un ataque fundamentado en la cláusula de comercio— será considerado válido si: (1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; (2) la contribución está distribuida o proporcionada equitativamente; (3) la contribución en cuestión no discrimina contra el comercio interestatal',(13) (4) la contribución está relacionada apropiadamente con los servicios provistos por el estado. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977). Véase, además, Iberia v. Srio. de Hacienda, 135 D.P.R. 57 (1994).(14)
En cuanto a dichos criterios, se ha sostenido que el tercer requisito es el dominante y que tanto el primero como el cuarto van dirigidos a demostrar que el estado tiene suficiente relación con la actividad que pretende tributar. Finalmente, el segundo va dirigido a asegurarse de que los *164 impuestos no obliguen al comercio interestatal a pagar más de lo que le corresponde. Tribe, op. cit, págs. 1106-1107.
D. Luego de haber expuesto el estado de derecho relativo al aspecto durmiente de la cláusula de comercio, procedemos a analizar en conjunto los señalamientos de error segundo y tercero. En esencia, los peticionarios alegan que el Art. 2 de la Ley Núm. 69, ante, discrimina en su propósito y en su efecto contra el comercio interestatal y, por ende, viola la cláusula de comercio y la referida See. 3 de la Ley de Relaciones Federales con Puerto Rico.
En primer lugar, debemos despachar, sin mayor análisis, la posible controversia de si la Ley Núm. 69, ante, aquí impugnada es discriminatoria de su faz, resaltando que en la petición jurada presentada ante el foro primario, los propios peticionarios reconocen que esta ley no lo es. Asimismo, destacamos que en este caso no existe disputa en cuanto a que la ley impugnada aplica por igual a empresas locales, estatales o internacionales, ya que las mencionadas empresas tendrán que pagar una contribución que dependerá del volumen de producción que tengan, independientemente de su lugar de origen.
A pesar de ello, los peticionarios alegan que erraron tanto el foro primario como el foro apelativo intermedio al no utilizar el historial legislativo de la Ley Núm. 69, ante, para determinar que la medida tenía un propósito discriminatorio o, en otras palabras, que sí era discriminatoria de su faz.
En cuanto a dicha postura, es menester señalar que en reiteradas ocasiones hemos resuelto que “si [una] ley carece de exposición de motivos, ésta generalmente recoge el propósito que inspiró su creación. No obstante, en aquellos casos en los cuales la ley carece de una exposición de motivos o, cuando aun teniéndola, no contiene la intención legislativa, es útil consultar otros documentos tales como los informes de las comisiones que estudiaron el proyecto *165 de ley y los debates celebrados cuando la medida fue discutida en el hemiciclo, según aparecen en el Diario de Sesiones”. Vicenti v. Saldaña, 157 D.P.R. 37, 48 (2002). Véase Chévere v. Levis, ante. En otras palabras, la norma en cuanto a cómo se debe analizar la intención legislativa de un estatuto es buscarla en la exposición de motivos y que solamente en casos en los que no exista una exposición de motivos o que la intención legislativa no esté allí expresada es que se recurre a otros documentos.
Y es que no puede ser de otra manera, ya que interpretar la intención legislativa de una ley a base de otros documentos diferentes a la exposición de motivos —claro está, cuando ésta contiene la susodicha intención— sería afirmar sub-silentio que la Asamblea Legislativa “dice una cosa pero quiere otra”. De igual forma, no es lo mismo interpretar un estatuto para poder aplicarlo, que interpretarlo con miras a determinar la intención del legislador a la hora de aprobarlo. En cuanto a dicha disyuntiva, resultan ilustradoras las expresiones siguientes del Tribunal Supremo federal:
Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress’ purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a “wiser” speech about it. (Énfasis suplido y escolios omitidos.) United States v. O’Brien, 391 U.S. 367, 383-384 (1968).
Este Tribunal ha hecho expresiones similares en cuanto *166 a la utilización de las expresiones de los legisladores durante el debate legislativo a la hora de interpretar una ley. A tales efectos hemos expresado que “es regla generalmente aceptada que las expresiones de un legislador, en el hemiciclo del cuerpo legislativo a que pertenece, no son suficientemente representativas de la intención colectiva del cuerpo que aprueba el estatuto”. F. Vázquez, Inc. v. Srio. de Hacienda, 103 D.P.R. 388, 390 (1975). Además, es norma reiterada que las leyes “han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer, ni de la actuación personal de uno de sus miembros”. Elicier v. Sucn. Cautiño, 70 D.P.R. 432, 437 (1949).
Expresado lo anterior, analizamos la Exposición de Motivos de la Ley Núm. 69, ante, para determinar si es necesario recurrir a otros documentos para establecer cuál fue la intención de los legisladores a la hora de aprobarla. La Exposición de Motivos, en su parte pertinente, dispone:
Las medidas impositivas que se establecen mediante esta medida no deben afectar otras áreas de la base económica del país. Por ello, en el caso de la cerveza, se utiliza el mecanismo avalado por el Tribunal Supremo de Puerto Rico en U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980), para garantizar que las industrias de menor producción puedan continuar operaciones de forma inalterada. En esos casos, según aumente su capacidad productiva, y como resultado, su estabilidad económica, se aumenta paulatinamente su responsabilidad con el fisco. Ante eso, es política pública del Estado Libre Asociado fomentar que industrias pequeñas que producen cervezas no reciban el peso del nuevo aumento de arbitrio hasta que su producción anual y capacidad económica lo justifiquen .... (Enfasis suplido.) 2002 (Parte 1) Leyes de Puerto Rico 263, 265-266.
De un análisis del texto antes citado se desprende con meridiana claridad y libre de ambigüedades que la intención de la Asamblea Legislativa a la hora de aprobar dicha ley fue la de aprobar un nuevo arbitrio mientras garantizaba, a su vez, que las cervecerías pequeñas pudieran con *167 tinuar operaciones sin recibir el peso de éste, hasta que su producción anual lo justificara. Recordemos que “cuando la ley es clara y libre de toda ambigüedad, se debe observar su letra”. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véase E.L.A. v. Rodríguez, 163 D.P.R. 825 (2005).
Conforme a lo expresado anteriormente, creemos que actuaron correctamente los Tribunales de Primera Instancia y el de Apelaciones al resolver que la intención legislativa que llevó a la aprobación de la Ley Núm. 69, ante, no es discriminatoria de su faz, ya que surge diáfanamente de su exposición de motivos. De igual forma, y contrario a lo sostenido por los peticionarios, entendemos que para llegar a dicha conclusión no había que auscultar las expresiones de varios legisladores durante el proceso del debate legislativo.
Por otro lado, los peticionarios sostienen que la ley impugnada tiene un efecto discriminatorio en el comercio interestatal. Para ello, se apoyan en Bacchus Imports, LTD v. Dias, ante, caso en el que el Tribunal Supremo federal invalidó una ley del estado de Hawaii, que establecía un impuesto a las bebidas alcohólicas con las únicas excepciones de dos bebidas que se producían únicamente en dicho estado.(15)
Al examinar el propósito de la mencionada legislación, el Tribunal Supremo federal expresó que “examination of the State’s purpose in this case is sufficient to demonstrate the State’s lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce”. Bacchus Imports, LTD v. Dias, ante, pág. 270. No obstante lo anterior, el máximo foro federal expresó: “Likewise, the effect of the exemption is clearly discriminatory, in that it applies only to locally produced beverages, even though it does not apply to all such products. Consequently, as long as there is some *168 competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect.” íd., pág. 271.
Como se puede apreciar de lo anterior, el Tribunal Supremo federal declaró inconstitucional la ley impugnada debido a que era discriminatoria de su faz —en su propósito— y por sus efectos. A raíz de esto último es que los peticionarios esbozan su argumento en cuanto a que la Ley Núm. 69, ante, es discriminatoria por su efecto. No obstante, somos del criterio que lo resuelto en Bacchus Imports, LTD v. Dias, ante, en cuanto al efecto discriminatorio de la ley, no aplica a este caso.
Primeramente las leyes involucradas en ambos casos son claramente diferentes. Mientras la de Bacchus Imports, LTD v. Dias, ante, intentaba proteger exclusivamente la industria hawaiana de licores, eximiendo de la aplicación del impuesto a varias bebidas que únicamente se producían en Hawái, la del caso de autos pretende garantizar que las industrias de menor producción —independientemente de su lugar de procedencia— puedan absorber la contribución impuesta sin cesar operaciones. Surge de la propia ley que para cumplir dicho propósito la Asamblea Legislativa de Puerto Rico estableció un sistema de exenciones escalonadas el cual intenta permitir que la responsabilidad de las compañías ante el fisco aumente paulatinamente mientras aumenta la estabilidad económica de éstas.(16)
Como vimos, en Bacchus Imports, LTD v. Dias, ante, el Tribunal Supremo federal le dio especial énfasis a que la única bebida beneficiada por la exención era hawaiana, cosa que no ocurre en este caso. Del expediente del caso *169 ante nuestra consideración se desprende que los propios peticionarios admiten que existen bebidas extranjeras —como Mike’s Hard Lemonade y Cruzan I Sland Cocktails— que se benefician de la exención especial y otras —como Samuel Adams y Bacardi Breezers— que fueron elegibles o descontinuaron su producción, por lo cual la cervecería local no es la única beneficiada por las exenciones ofrecidas por dicho estatuto.
Además, es un hecho no disputado que las exenciones aprobadas aplican y pueden aplicar de igual manera a las cervecerías locales, estatales o extranjeras, permitiendo que el nivel contributivo varíe dependiendo de la producción anual de éstas. O sea, que una cervecería que hoy se beneficie de alguna de las exenciones impuestas, al año siguiente puede beneficiarse de una menor o hasta de ninguna, dependiendo de cómo varíe su producción. Asimismo, resulta poco arriesgado afirmar que las cervecerías extranjeras pequeñas pudieran acogerse al mencionado beneficio si deciden vender sus productos en Puerto Rico.
En otras palabras, para resolver que el efecto del Art. 2 de la Ley Núm. 69, ante, es discriminatorio contra el comercio interestatal se requiere una determinación de que dicha ley tiene el efecto de no permitir que entidades fuera de Puerto Rico se acojan a sus beneficios, lo que según hemos visto no es correcto.
Asimismo, aunque es cierto que la cláusula de comercio en su estado durmiente prohíbe que los estados aprueben leyes económicas que discriminen contra productos extranjeros por razón de su lugar de origen, no podemos afirmar que dicha cláusula prohíbe que un estado apruebe una ley que, en términos técnicos, aplique de forma diferente a diversos productos o productores. Claro, ello será así siempre y cuando dicha diferencia no tenga nada que ver con la procedencia de los productos, sino con aspectos comunes o neutrales que puedan variar de compañía en compañía independientemente de su lugar de origen. Al respecto resul *170 tan pertinentes las expresiones siguientes del Tribunal Supremo federal: “ [T]he Commerce Clause is not violated when the differential tax treatment of two categories of companies ‘results solely from differences’ between the nature of their businesses, not from the location of their activities.” (Énfasis suplido.) Kraft Foods v. Iowa Dept. of Rev., 505 U.S. 71, 78 (1992).
Por dichos fundamentos, somos del criterio que el Art. 2 de la Ley Núm. 69, ante, no discrimina por su aplicación o efecto contra el comercio interestatal. Ahora bien, aquí no termina nuestro análisis. Como mencionamos anteriormente, las leyes contributivas estatales, además de que no sean discriminatorias, deben cumplir con otros criterios para sobrevivir a un ataque al amparo de la cláusula de comercio. Estos criterios son, que: (1) el impuesto aplique a alguna actividad que tenga un nexo sustancial con el estado, (2) esté justamente distribuido y (3) se relaciona adecuadamente con servicios ofrecidos por el estado.
Los peticionarios no han esbozado argumento alguno dirigido a demostrar que el Art. 2 de la Ley Núm. 69, ante, no cumple con algunos de los criterios mencionados. No obstante ello, resulta claro que el impuesto que establece la Ley Núm. 69, ante —y, por ende, la exención impugnada— aplica a una actividad con nexo sustancial con Puerto Rico y se relaciona con servicios ofrecidos por éste, o sea, la autorización para la venta de bebidas alcohólicas en nuestra jurisdicción. Además, está justamente distribuido, ya que la exención es menor mientras más producción tenga la empresa.
Finalmente, debemos mencionar que cuando se impugna una ley estatal que impone un impuesto por alegadamente discriminar contra el comercio internacional también hay que analizar los criterios siguientes: (1) “whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation”, y (2) “whether the tax prevents the Federal Government from ‘spea *171 king with one voice when regulating commercial relations with foreign governments’ Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 451 (1979).
En cuanto al primer criterio, el Tribunal Supremo federal ha indicado que un impuesto estatal será validado a menos que el riesgo de doble tributación sea inevitable. Barclays Bank PLC v. Franchise Tax Board of Cal., 512 U.S. 298 (1994); Container Corp. v. Franchise Tax Bd., 463 U.S. 159 (1983). Resulta obvio que el impuesto que da pie a la exención aquí impugnada no expone un riesgo para la doble tributación, ya que solamente recae sobre la bebida que se vende en Puerto Rico.
Sobre el segundo criterio, lo que se pretende es evitar que se desvirtúe el interés Congresional en establecer una uniformidad en cuanto a las relaciones comerciales con otros países. Dicho criterio presupone que el Congreso haya expresado de forma clara su intención de crear la mencionada uniformidad. Barclays Bank PLC v. Franchise Tax of Cal., ante. En el caso no existe intención congresional de mantener la mencionada uniformidad y, además, existe un sinnúmero de estados con leyes diferentes que imponen distintos impuestos a las cervezas y demás bebidas.(17)
Somos del criterio, repetimos, que el Art. 2 de la Ley Núm. 69, ante, no viola la cláusula de comercio interestatal, ya que: (1) no tiene un propósito discriminatorio; (2) no tiene un efecto discriminatorio; (3) aplica a una actividad que tiene un nexo sustancial con Puerto Rico; (4) está justamente distribuido; (5) se relaciona adecuadamente con servicios ofrecidos por el estado; (6) no constituye un riesgo sustancial de múltiple tributación, y (7) no afecta algún posible interés del gobierno federal en mantener una uni *172 formidad con el comercio internacional.(18) En conclusión, opinamos que actuaron correctamente tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones al desestimar la petición jurada que motivó el caso de autos.
Por todo lo anteriormente expuesto, es que estamos conformes con la sentencia emitida por el Tribunal en el presente caso.
Opinión de conformidad emitida por el
Juez Asociado Señor Fuster Berlingeri.
I
Estoy conforme con la sentencia emitida por el Tribunal en el caso de autos. Para mí es claro que el Art. 2 de la Ley Núm. 69 de 30 de mayo de 2002 (13 L.P.R.A. sec. 9574) no tiene defecto constitucional alguno, por lo que procede la desestimación de la acción incoada por los demandantes, como correctamente lo decidieron antes el foro de instancia y el foro apelativo.
Para resolver este caso sólo es menester aplicar a sus hechos lo resuelto antes por este Foro en U.S. Brewers Assoc. v. Srio. de Hacienda, 109 D.P.R. 456 (1980) —que presentaba una situación esencialmente idéntica a la del caso de autos— tal como lo hicieron correctamente los foros a quo. U.S. Brewers Assoc. v. Srio. de Hacienda, supra, es un claro precedente determinativo de la controversia en el *173 caso de autos, que puede adjudicarse sencillamente con sólo aplicar aquí el precedente referido.
No obstante, deseo tratar en esta opinión el espinoso asunto de si aplica ex proprio vigore a Puerto Rico las limitaciones que proceden de la cláusula de comercio interestatal de la Constitución federal. El asunto fue planteado en el caso de autos y provocó la otra opinión de conformidad que se ha emitido aquí, la cual considero errada y propensa a causar confusión. Por ello, me parecer menester entrar a considerar a fondo esta cuestión.
Se trata de un asunto que ha estado ante nuestra consideración varias veces antes, pero que este Tribunal ha tratado con ambivalencia, al menos en épocas recientes. En las primeras ocasiones que el asunto se planteó, este Tribunal resolvió muy deliberadamente que el llamado aspecto “durmiente” de la cláusula de comercio de la Constitución federal no aplicaba a Puerto Rico. Lo resolvimos así antes del establecimiento del Estado Libre Asociado, en la enjundiosa decisión de Ballester Hnos. v. Tribunal de Contribuciones, 66 D.P.R. 560 (1946). Luego del establecimiento del Estado Libre Asociado, lo volvimos a resolver en la muy ponderada y medular decisión de R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964), al igual que en South P.R. Sugar Corp. v. Com. de Servicio Púb., 93 D.P.R. 12 (1966). Sin embargo, a pesar de esos claros y substanciosos precedentes, más recientemente, en un caso en que se volvió a plantear el asunto, este Foro titubeó y optó por no reiterar lo resuelto antes en las tres opiniones citadas. Prefirió limitarse a señalar que aun si la cláusula de comercio aplicara, los hechos en cuestión no constituían una violación a dicha cláusula. M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 336 (1987).
En mi criterio, el tema aludido merece el mayor estudio y reflexión por la sencilla razón de que la errada noción de que la cláusula de comercio interestatal de la Constitución federal aplica a Puerto Rico ex proprio vigore, pone sobre *174 las espaldas del Gobierno del país una innecesaria carga jurídica que opera como una limitación más a su capacidad de encarar con éxito los graves problemas económicos de Puerto Rico. No queda, pues, otra alternativa que denunciar con vehemencia la supuesta aplicabilidad de la cláusula referida y explicar los fundamentos de nuestro parecer. Veamos.
II
¿Por qué prevalece aún entre algunos en Puerto Rico la errada noción de que nuestro país está sujeto a las limitaciones que proceden de la cláusula sobre el comercio interestatal de la Constitución norteamericana? ¿Por qué no se acatan las tres opiniones de este Tribunal, citadas dos párrafos atrás, que resuelven definitivamente la inaplicabilidad a Puerto Rico de la normativa federal en cuestión? ¿Cuál es la razón detrás del empeño por introducir en nuestra jurisprudencia el erróneo criterio jurídico de que a Puerto Rico le obliga el aspecto durmiente de la cláusula de comercio interestatal de la Constitución americana?
La respuesta a las interrogantes anteriores la encontramos en un supuesto “caso clave” del Tribunal del Primer Circuito de Apelaciones federal en el que se fundamenta la otra opinión de conformidad emitida en este caso. Dicha opinión evidentemente no es nada más que una secuela de la sentencia federal aludida, que se ha adoptado aquí de modo mimético. Por ello, hay que ir a la fuente originaria del asunto, para examinar críticamente lo decretado allí.
III
El Primer Circuito federal había resuelto desde 1932 que la cláusula de comercio interestatal de la Constitución de Estado Unidos no aplicaba a Puerto Rico. Lo hizo así en *175 Lugo v. Suazo, 59 F.2d 386 (1er Cir. 1932), y lo reiteró en Buscaglia v. Ballester, 162 F.2d 805 (1er Cir. 1947), cert. denegado, 332 U.S. 816 (1947). Así que, por décadas, tanto el Tribunal Supremo de Puerto Rico como el Tribunal de Apelaciones del Primer Circuito federal sostuvieron reiteradamente que no aplicaba a Puerto Rico esta cláusula. Los fundamentos para lo resuelto por uno y otro foro fueron esencialmente los mismos y pueden resumirse como se explica a continuación.
Desde sus inicios, la relación entre Estado Unidos y Puerto Rico ha estado sujeta al principio fundamental de que la Constitución federal no aplica enteramente a Puerto Rico, por no ser ni haber sido nunca la isla un territorio incorporado a la Unión Americana ni formar parte integral de Estados Unidos. El Tribunal Supremo federal ha resuelto reiteradamente que sólo aplican con plenitud a Puerto Rico las garantías de los principales derechos fundamentales de las personas provistas por la Constitución de Estados Unidos, que por su propia naturaleza siempre limitan el ejercicio del Poder Ejecutivo y Legislativo federal. Una de las cláusulas de dicha Constitución que nunca ningún tribunal federal había aplicado a Puerto Rico era precisamente la relativa al comercio, que dispone que el Congreso tiene la facultad de regular el comercio entre varios estados (“commerce ... among the several States”). Puerto Rico, claro está, no es un “estado”, por lo que se había resuelto reiteradamente que la isla no estaba cobijada dentro del poder congresional de regular el comercio entre los estados. Lo anterior no significaba que el comercio entre Puerto Rico y Estados Unidos no estuviese sujeto al poder del Congreso; sólo que ello se regulaba únicamente mediante la cláusula que le otorga al Congreso el poder de reglamentar los territorios de Estados Unidos, la llamada Cláusula Territorial. Es por lo anterior que la cláusula de comercio, en su aspecto “durmiente”, siempre *176 había sido concebida sólo como una limitación a los poderes de los estados; nunca como una limitación a los poderes gubernamentales de los territorios.
Sobre lo señalado en el párrafo anterior, debe tenerse en cuenta, además, la conocida renuencia del Tribunal Supremo de Estados Unidos a atribuirle vigencia a Puerto Rico sobre cualquier disposición de la Constitución federal que se refiera literalmente a los “estados” de la Unión (states). Así, pues, en Puerto Rico v. Branstad, 483 U.S. 219 (1987), el Tribunal Supremo federal aplicó a Puerto Rico el estatuto federal de extradición, que abarca expresamente a los territorios de Estados Unidos, para no tener que resolver si la Cláusula de Extradición de la Constitución federal —Art. IV, Sec. 2, Const. EE. UU., L.P.R.A., Tomo 1— aplicaba a Puerto Rico.(1) El más alto foro federal señaló lo siguiente:
It is true that the words of the [Extradition] clause apply only to “States” and we have never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred upon the States under the Constitution. We need not decide today what applicability the Extradition Clause may have to the Commonwealth of Puerto Rico, however, for the Extradition Act clearly applies. The Act requires rendition of fugitives at the request of a demanding “Territory”, as well as a State. Puerto Rico v. Branstad, ante, pág. 229.
La renuencia aludida, ilustrada por el caso Puerto Rico v. Branstad, supra, ha sido manifestada en varias otras decisiones importantes del Tribunal Supremo de Estados Unidos concernientes a Puerto Rico. Así pues, en Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974), dicho Foro determinó que las garantías del debido proceso de ley y de la igual protección de las leyes aplicaban a Puerto Rico, pero rehusó resolver que la Decimocuarta En *177 mienda de la Constitución federal, que extiende tales garantías expresamente a los estados de la Unión, aplicase a Puerto Rico por no ser éste un estado. El Tribunal optó por resolver que las normas constitucionales referidas aplicaban a Puerto Rico al amparo de la Quinta o de la Decimocuarta Enmienda, sin precisar cuál (either-or). Así mismo sucedió en Examining Bd. v. Flores Otero, 426 U.S. 572 (1976). En este caso, uno de los Jueces del Tribunal, el Juez Rehnquist, quien luego fue Juez Presidente, expresó lo siguiente en su propia opinión disidente, en parte:
The Fourteenth Amendment is by its terms applicable to States: Puerto Rico is not a State. ... I would be inclined to reject the claim that the Fourteenth Amendment is applicable to Puerto Rico until a case sufficiently strong to overcome this “plain meaning” obstacle, found in the language of the Amendment itself, is made out. Id., pág. 607.
A la luz de lo anterior, que alude a casos resueltos después de la creación del Estado Libre Asociado, parece evidente que el propio Tribunal Supremo de Estados Unidos no estaría dispuesto a sostener que la disposición de la Constitución federal que regula el comercio entre varios estados (“among ... the several States”) de modo alguno se refiera a Puerto Rico, que claramente no es un estado.
Cuando el Tribunal del Primer Circuito federal decidió revocarse sobre este asunto en 1992, lo hizo mediante un análisis muy limitado y superficial, que no replicaba de modo alguno los fundamentos de los precedentes contrarios tanto de ese mismo foro como los de este Tribunal. Su “análisis” se limitó, en esencia, a apoyarse en dos señalamientos. Primero, que la creación del Estado Libre Asociado procuró conceder a Puerto Rico el grado de autonomía e independencia que normalmente se asocia con los estados de la Unión. Por ende, razonó dicho Foro, aplicaban a Puerto Rico las limitaciones que aplican a los estados de la Unión.
*178 Nótese que este primer argumento tiene la anomalía, para no decir el desatino, de derivar una limitación de poder invocando una concesión de autonomía de poder. El argumento falaz es que como a Puerto Rico se le concedió, al crearse el Estado Libre Asociado, un mayor grado de autonomía que el que tenía antes, comparable al de los estados de la Unión, se le impuso a la vez una limitación de poder que no tenía antes. Es decir, a la reiterada afirmación formulada por el propio Tribunal Supremo federal, reconociendo la mayor autonomía que significaba para Puerto Rico la creación del Estado Libre Asociado (Puerto Rico v. Branstad, supra; Examining Bd. v. Flores de Otero, supra), el Tribunal del Primer Circuito le añadió como cosa suya una limitación, que no surge de ningún modo de lo expresado por el más Alto Foro federal, y que no es de manera alguna compatible con la evidente intención del Tribunal Supremo de Estados Unidos de resaltar la importancia de lo creado mediante la Ley Pública 600 (64 Stat. 319). El Tribunal Supremo federal —que ha reclamado sólo para sí la autoridad de determinar qué cláusulas de la Constitución federal le aplican a Puerto Rico, en ausencia de alguna disposición congresional al respecto (Torres v. Puerto Rico, 442 U.S. 465 (1979); Examining Bd. v. Flores de Otero, supra)— nunca ha determinado que la cláusula de comercio aplica a Puerto Rico, aun luego de habérsele planteado el asunto. A pesar de ello, sin embargo, el foro apelativo intermedio federal se ha creído facultado a inmiscuirse en el tema, para decretar lo que el más Alto Foro judicial no ha estimado procedente resolver.
Más aún, la noción del Tribunal Supremo federal de que la creación del Estado Libre Asociado aparejó a Puerto Rico a los estados de la Unión en autonomía e independencia, escasamente puede manejarse con la laxitud que la utiliza el Tribunal del Primer Circuito en la jurisprudencia que aquí nos concierne. Ello, no sólo por el hecho de que los informes congresionales con respecto a la Ley Pública 600 *179 (64 Stat. 319) hacen hincapié en que con la creación del Estado Libre Asociado no se pretendió alterar fundamentalmente la relación entre Estados Unidos y Puerto Rico (véase U.S. v. López Andino, 831 F.2d 1164, 1172 (1er Cir. 1987), opinión concurrente del Juez Torruellas), sino, además, por el otro hecho innegable de que la propia autonomía de los estados de la Unión se afinca en gran medida en sus poderes políticos de representación congresional plena y de voto presidencial —ninguna de las cuales tiene Puerto Rico— y en la garantía que provee la Décima Enmienda de la Constitución americana, que de ningún modo abarca a Puerto Rico. Por ello, es menester ser cauteloso y no pretender derivar nuevas y extrañas conclusiones, partiendo de la premisa de que Puerto Rico posee “la autonomía y la independencia” de un estado de la Unión.
Finalmente, al ponderar el asunto que aquí nos concierne, sobre el significado que puede derivarse de la creación del Estado Libre Asociado de Puerto Rico, es menester considerar lo que ha dicho también el propio Tribunal Supremo federal:
... Puerto Rico ... is an autonomous political entity, “sovereign over matters not ruled by the Constitution ...”. Posadas de P.R. Assocs. v. Tourism Co., 478 U.S. 328, 339 (1986). Véase Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982).
Parecería que la pretensión de imponer una limitación sobre los poderes legislativos de Puerto Rico al amparo del aspecto “durmiente” de la cláusula de comercio es claramente improcedente e incompatible con esta otra expresión del Tribunal Supremo americano. Cuando menos, la postura de la otra opinión de conformidad en este caso haciéndole eco ahora al decreto en cuestión del Primer Circuito no armoniza de modo alguno con las reiteradas ex-presiones del Tribunal Supremo de Puerto Rico sobre la amplia autoridad jurídica del Estado Libre Asociado. Véanse: Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141 (1997); Pueblo v. Castro García, 120 D.P.R. 740 (1988); *180 R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964); Pueblo v. Figueroa, 77 D.P.R. 188 (1954).
IV
El otro señalamiento en que se apoyó el Primer Circuito en su referida decisión de 1992 es la noción de que Puerto Rico comparte la plena integración económica con Estados Unidos como cualquier estado de la Unión. La supuesta “lógica” de este otro señalamiento es que al estar Puerto Rico en una situación comparable a la de un estado de la Unión en lo que se refiere a la “integración económica de los Estados Unidos”, debe aplicarle a Puerto Rico la misma limitación que le aplica a los estados de la Unión en cuanto al comercio interestatal. El problema con este otro argumento es que es tan falaz como el primero, que se discutió en los párrafos anteriores.
La noción de que Puerto Rico comparte con los estados de la Unión una comparable integración económica a Estados Unidos choca de frente con varias realidades que son conocidas por los que tratan bien con estos asuntos. Puerto Rico, para comenzar, no está sujeto a las leyes de rentas internas federales como lo están los estados de la Unión. Por un lado, los residentes de Puerto Rico no pagan impuestos ni contribuciones federales como lo hacen los residentes de los estados de la Unión. Por otro lado, los fondos que se obtienen de los arbitrios federales que se cobran en Estados Unidos con respecto a los artículos y materiales manufacturados en Puerto Rico —los arbitrios sobre el ron— se destinan al erario nuestro, contrario a lo que sucede con todos los otros arbitrios federales que se cobran en los estados de la Unión sobre los artículos y materiales manufacturados en éstos, que ingresan al erario federal como es natural. La situación contributiva especial de Puerto Rico mencionada, que representa por sí sola miles de millones de dólares anualmente que benefician a la eco *181 nomía de Puerto Rico de un modo no asequible a ningún estado de la Unión, es claramente contraria a la falaz noción de igual “integración económica” mencionada.
Otra diferencia entre los estados de la Unión y Puerto Rico relativa a lo económico es que la Ley sobre Comercio Interestatal federal expresamente no aplica a la isla aunque regula intensamente aspectos de la transportación de los estados de la Unión. Este dato presenta un problema serio para los que afirman que la cláusula de comercio interestatal de la Constitución federal aplica a Puerto Rico. Evidentemente resulta cuando menos incompatible que se considere que la referida disposición constitucional ha sido extendido a la isla tácitamente por el Congreso, pero que tmo de los estatutos principales legislado por el mismo Congreso al amparo de dicha disposición no se extiende a Puerto Rico. En la otra opinión de conformidad emitida en este caso ni se intenta explicar este enredo. De cualquier modo, el estatuto en cuestión aplica a los estados de la Unión pero no a Puerto Rico, lo que forma parte de las amplias diferencias entre los estados y Puerto Rico en lo referente a asuntos económicos.
También debe mencionarse otra diferencia muy particular, que es la relativa a las tarifas sobre el café. En virtud de la Sec. 10 del Art. I de la Constitución federal, L.P.R.A., Tomo 1, los estados de la Unión están, de ordinario, impedidos de imponer contribuciones sobre las importaciones. No obstante, Puerto Rico ha sido expresamente autorizado a imponer tarifas sobre el café importado aunque los estados de la Unión no pueden hacerlo. Véanse: 19 U.S.C.A. sec. 1319; Miranda v. People of Puerto Rico, 101 F.2d 26 (1er Cir. 1938). De esta forma, Puerto Rico puede proteger su propia industria del café de la competencia que representa la importación del café más barato del extranjero.
Además de lo relativo a rentas internas y a las tarifas sobre el café, existen varios otros esquemas jurídicos y reglamentarios federales, también de índole económica, cuya *182 aplicación a Puerto Rico es muy distinta a la de los estados de la Unión. Sería prolijo enumerarlas todas aquí. Basta con señalar que se trata de asuntos de gran importancia económica con respecto a los cuales la situación de Puerto Rico es notablemente distinta a la de cualquier estado de la Unión. Así pues, programas de ayuda económica, incluyendo los de asistencia para alimentos, el Seguro Social, el salario mínimo federal, algunas leyes bancarias y leyes laborales federales, las leyes sobre tarifas aduaneras, las relativas a almirantazgo y transportación marítima y varias sobre otros asuntos, aplican o han aplicado históricamente de manera diferente en Puerto Rico en comparación con su vigencia en los estados de la Unión. Véase A.H. Leibowitz, The Applicability of Federal Law To The Commonwealth of Puerto Rico, 37 Rev. Jur. U.P.R. 615 (1968).
Con relación a lo anterior, también es menester tomar en cuenta la reiterada postura del Tribunal Supremo federal que valida el trato distinto del Congreso con respecto a Puerto Rico, en comparación con el trato del Congreso a los estados de la Unión en todas estas cuestiones económicas. El más Alto Foro federal ha resuelto expresamente que el Congreso no tiene que darle a Puerto Rico el mismo trato económico que le da a los estados, legitimando así las importantes diferencias que existen o han existido entre Puerto Rico y éstos. De este modo, el propio Tribunal Supremo federal ha rechazado la noción de que la isla y los estados de la Unión comparten una misma integración económica con la nación americana. Algunas de tales decisiones, para citar sólo las más recientes, son Harris v. Rosario, 446 U.S. 651 (1980), en la cual el Tribunal Supremo federal determinó que el Congreso no estaba obligado a tratar a Puerto Rico igual que un estado en el programa Aid to Families with Dependent Children, y Califano v. Torres, 435 U.S. 1 (1978), en el cual el Tribunal Supremo federal determinó lo mismo con respecto al programa Supplemental Security Income (SSI).
*183 Debe señalarse que el Tribunal Supremo federal ha sostenido la validez del trato diferente a Puerto Rico no sólo cuando el Congreso le ha dado menos a la isla que lo que ha dispuesto en beneficio de los residentes de los estados de la Unión, como en los dos casos citados en el párrafo anterior, sino también cuando el trato diferente ha consistido en darle a Puerto Rico más que lo que pueden hacer los estados de la Unión, como sucedió en West India Oil Co. v. Domenech, 311 U.S. 20 (1940), relativo a los poderes de imponer arbitrios sobre importaciones, en el cual el Tribunal Supremo federal validó un poder otorgado por el Congreso a Puerto Rico que los estados de la Unión no poseían.
Es por todo lo anterior que no puede afirmarse verazmente que Puerto Rico es comparable a cualquier estado de la Unión en lo que se refiere a la integración económica nacional. Puerto Rico, como los territorios no incorporados, siempre ha estado sujeto a importantes normas diferentes a las que aplican a los estados de la Unión. Con tal trato diferente se ha procurado proveer la flexibilidad económica necesaria para que tanto el Congreso como Puerto Rico mismo puedan encarar exitosamente las significativas diferencias materiales que han existido y todavía existen entre la isla y las jurisdicciones que forman parte integral de Estados Unidos. Parece necesario mencionar la conocida realidad de que Puerto Rico, con todo lo que ha progresado económicamente desde los años terribles de 1898 a 1940, sigue estando separado por una abismal diferencia entre su frágil situación económica y la muy superior condición del estado más pobre de la nación americana. No tiene sentido alguno, pues, que se pretenda imponer una limitación artificial a las facultades de Puerto Rico para encarar sus propios problemas económicos, sólo por puro capricho judicial. Ni el Primer Circuito ni la otra opinión de conformidad en el caso de autos han identificado qué propósitos de orden público persiguen lograr con su ofuscado decreto. ¿Qué justificación existe para su dictamen? Más allá de su *184 errado conceptualismo, ¿a qué responde la desatención a los tres precedentes de este mismo Foro? ¿A quién le causa daño que Puerto Rico pueda tener una facultad que los estados de la Unión no tienen?
V
Las interrogantes plantadas en el párrafo anterior conducen a un último señalamiento crítico. La cuestión de si la cláusula sobre comercio interestatal de la Constitución federal debe aplicarse o no a Puerto Rico, como la cuestión más general de qué disposiciones constitucionales federales deben extenderse a la isla, más allá de las relativas a los derechos fundamentales de las personas, es en última instancia una prerrogativa congresional. Véase Torres v. Puerto Rico, supra, págs. 469-470. Se trata de un asunto eminentemente político, que está comprendido, además, dentro de los amplios poderes que el propio Tribunal Supremo le ha reconocido al Congreso aun recientemente. Harris v. Rosario, supra, págs. 653-656. Es por ello que las decisiones del Primer Circuito en las que se somete a Puerto Rico ex proprio vigore a las limitaciones de la cláusula de comercio en su fase “durmiente” es un acto ultra vires de ese tribunal, una intervención claramente indebida de ese foro en un asunto que rebasa su autoridad. No hay nada en el expediente legislativo que permita siquiera suponer que el Congreso ha tenido la intención de extender la cláusula referida a Puerto Rico. Por ende, no puede considerarse de modo alguno que las decisiones del Tribunal del Primer Circuito son sólo declarativas de la intención congresional. Constituyen, por ende, un acto de inmiscuirse indebidamente en un asunto que es una clara prerrogativa sólo del Congreso.
Es, en fin de cuentas, por lo anterior sobre todo que considero insostenible la otra opinión de conformidad en el caso de autos de servirle de eco al foro apelativo federal, *185 copiando aquí sus muy desacertadas y erróneas decisiones sobre el asunto en cuestión.

 Véanse: Leyes Núms. 12 de 10 de junio de 1981 (13 L.P.R.A. sec. 6006) y 22 de 14 de julio de 1989 (13 L.P.R.A. secs. 6006 y 6021a).

 El Art. 2 mencionado dispone, en lo pertinente, lo siguiente:
“(a) En lugar del impuesto establecido en [la sec. 9521(c)(2) y (3) del título 13 de L.P.R.A.,] sobre toda la cerveza, extracto de malta y otros productos análogos fermentados o no fermentados cuyo contenido alcohólico exceda de uno y medio por ciento (1 V&%) por volumen a que se [refiere la sec. 9521(c)(2) y (3) del título 13 de L.P.R.A.], que sean producidos o fabricados por personas cuya producción total, si alguna, de dichos productos durante su más reciente año contributivo no haya excedido de treinta y un millones (31,000,000) de galones medida, se cobrará un impuesto de la siguiente forma:
“Dos dólares con quince centavos ($2.15) por cada galón medida producido, hasta nueve millones (9,000,000) de galones medida;
“Dos dólares con treinta y seis centavos ($2.36) por cada galón medida producido en cantidad mayor a nueve millones (9,000,000) pero menor a diez millones (10,000,000);
“Dos dólares con cincuenta y siete centavos ($2.57) por cada galón medida producido en cantidad mayor a diez millones (10,000,000) pero menor a once millones (11,000,000);
“Dos dólares con setenta y ocho centavos ($2.78) por cada galón medida *145 producido en cantidad mayor a once millones (11,000,000) pero menor a doce millones (12,000,000);
“Dos dólares con noventa y nueve centavos ($2.99) por cada galón medida producido en cantidad mayor a doce millones (12,000,000) pero menor a treinta y un millones (31,000,000).
“Sujeto a las disposiciones de [las sees. 9575 a 9579 del título 13 de L.P.R.A.], los beneficios de esta sección procederán para una persona en cualquier año contributivo siguiente a aquel año en que su producción total de los productos descritos en este apartado, si alguno, no haya excedido de treinta y un millones (31,000,000) de galones medida.” 2002 (Parte 1) Leyes de Puerto Rico 263, 270.

 Art. I, Sec. 8, Const. EE. UU., L.P.R.A., Tomo 1.

 Los demandados comparecieron en dos mociones diferentes. Por un lado, comparecieron la Cervecería India y su distribuidora, y por el otro lado, comparecieron el Estado Libre Asociado y el Secretario de Hacienda.

 El foro primario tomó dicha determinación debido a que, entre otras cosas, “las determinaciones de si la Legislatura de Puerto Rico tuvo propósitos discriminatorios contra la cerveza importada y si la Ley aplica solamente a empresas locales y por ello tiene efecto discriminatorio, es la misma independientemente de si el reclamo es por violación a [la See. 3] de la Ley de Relaciones Federales y a la igual protección de las leyes, o por alegada violación a la cláusula de comercio interestatal e internacional”. Sentencia del Tribunal de Primera Instancia, pág. 12, Apéndice, pág. 774.

 Vale la pena destacar que en South P.R. Sugar Corp. v. Com. de Servicio Púb., 93 D.P.R. 12 (1966), indicamos que la tarifa impuesta por una Comisión era válida, aun cuando la cláusula de comercio interestatal fuera aplicable a Puerto Rico en la misma forma que a los estados federales.

 A pesar de ello se sostuvo la vigencia de la ley impugnada amparándonos en una interpretación razonable que subsanaba las posibles fallas que ésta podría tener. Véase Banco Popular v. Mun. de Mayagüez, 126 D.P.R. 653 (1990).

 Con el pasar de los años la controversia en cuanto a este tema se ha ceñido a la posible aplicación del aspecto durmiente de la cláusula de comercio y se ha dejado a un lado la controversia relativa a la aplicación de la cláusula de comercio en su aspecto relativo al poder del Congreso de regular el comercio interestatal. En cuanto a ello, nos parecen sumamente pertinentes las expresiones siguientes del Primer Circuito de Apelaciones en Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 7-8 esc. 3 (1er Cir. 1992):
“Both the Supreme Court and this court have long held or assumed that Congress has power under the Commerce Clause to regulate commerce with Puerto Rico. See Secretary of Agric. v. Central Roig Refining Co., 338 U.S. 604, 616 (1950)(Sugar Act of 1948 applied to Puerto Rico through the Commerce Clause); Puerto Rico Tel. Co. v. F.C.C., 553 F.2d 694, 701 (1st Cir. 1977)(Federal Communications Commission regulations applied via the Commerce Clause to government-owned telephone company in Puerto Rico). Thus, in one aspect, the question “whether the Commerce Clause applies to Puerto Rico” has been settled in the affirmative for many years ....”

 Art. IV, Sec. 3 de la Constitución federal, L.P.R.A., Tomo 1.

 Califano v. Torres, 435 U.S. 1 (1978); Examinig Bd. v. Flores de Otero, 426 U.S. 572 (1976).

 La única referencia a la exclusión de Puerto Rico sobre alguna legislación relativa al comercio interestatal está en la See. 38 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1, que dispone que la Ley de Comercio Interestatal no aplicará a Puerto Rico. No obstante, dicho artículo no puede prohibir más de lo que expresamente dispone, por lo que no se le puede conceder el alcance de impedir la aplicación en nuestra jurisdicción de una disposición constitucional como lo es la cláusula de comercio interestatal. Para expresiones similares, véase Sea-Land Services, Inc. v. Municipality of San Juan, 505 F. Supp. 533, 544 esc. 46 (D.P.R. 1980), citando a D.M. Helfeld, How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico? XXXIX (Núm. 2) Rev. Jur. U.P.R. 169 (1969).

 “[X]he burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Oregon Waste Systems, Inc. v. Department of Enviroment Quality of Ore., 511 U.S. 93, 99 (1994).

 Este tercer elemento, se ha analizado de acuerdo con el enfoque tradicional que se utiliza cuando una ley es atacada por alegadamente violar el aspecto durmiente de la cláusula de comercio interestatal. L.H. Tribe, American Constitutional Law, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, pág. 1106. Es decir, que una ley estatal que discrimina contra el comercio interestatal o internacional —ya sea de su faz o por su efecto— es virtualmente inválida o inválida per se. Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334 (1992); Philadelphia v. New Jersey, 437 U.S. 617 (1978); Brown-Forman Distillers v. N.Y. Liquor Auth., 476 U.S. 573 (1986); Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Véase, además, Tribe, op. cit., pág. 1059.

 Este test también recoge requisitos del debido proceso de ley. Véase Tribe, op. cit., pág. 1106.

 Dichas bebidas eran el Okolehao, bebida elaborada a base de la raíz de una planta oriunda de Hawaii, y los vinos de frutas.

 Debemos resaltar que la Asamblea Legislativa posee una amplia discreción en el campo contributivo y que “[tlradicionalmente la ‘clasificación’ ha sido un método para ajustar los programas contributivos a las necesidades y usos locales a fin de lograr una distribución equitativa en la carga contributiva”. U.S. Brewers Assoc. v. Srio. de Hacienda, ante, pág. 460, citando a Miranda v. Sec. de Hacienda, 77 D.P.R. 171, 178 (1954).

 Véanse, a modo de ejemplo: Wyo. Stat. Sec. 12-3-101 (Wyoming); W. Va. Stat. Sec. 11-16-13 (West Virginia); 72 P.S. See. 9010 (Pennsylvania); N.M. Stat. Ann. Sec. 7-17-2 (Nuevo México); Wis. Stat. See. 139.02(1) (Wisconsin); Tex. Aleo. Bev. Code Sec. 203.01 (Texas).

 Los peticionarios también arguyen que el Art. 2 de la Ley Núm. 69, ante, viola la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Ciertamente, ante nuestra opinión con respecto a la cláusula de comercio, resulta innecesario atender dicho planteamiento, ya que el análisis requerido por la cláusula de comercio es, por lo menos, más estricto que el que requiere la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante. Así pues, entendemos que una ley que supere el análisis requerido por la cláusula de comercio —como lo es el Art. 2 de la Ley Núm. 69, ante— obligatoriamente superará un ataque al amparo de la See. 3 de la Ley de Relaciones Federales con Puerto Rico, ante.

 La Cláusula de Extradición, en lo pertinente, dispone:
“Toda persona acusada de ... delito ... que huye del estado en donde se le acusa y fuera hallada en otro estado, será ... devuelta al estado que tuviera jurisdicción para conocer del delito.” Const. EE. UU., L.P.R.A., Tomo 1, ed. 1999, pág. 175.